DUDLEY A. TYNG & CO. *v.* CONVERSE.

1. CONTRACTS—OFFER AND ACCEPTANCE—MEETING OF MINDS.
   Before a contract can be completed there must be an offer and acceptance.

2. SAME—CONSTRUCTION—SALE—PRINCIPAL AND AGENT.
   Where defendant wrote to plaintiff corporation to buy certain stock at a price mentioned, and later told plaintiff's representative over the telephone to let the offer stand, that defendant would be glad to get the stock at that price any time, although plaintiff's version of the conversation was disputed by the defendant, there was sufficient evidence to sustain a finding that the defendant had given a standing order for the purchase of the stock.

3. SAME—FRAUDS, STATUTE OF.
   An offer may be accepted by telephone or telegraph.

4. SAME—PLACE OF ACCEPTANCE—CONFLICT OF LAWS.
   The place of a contract is generally determined by the place at which the acceptance is given: the contract is made where the acceptance is posted.

5. SAME—TELEPHONE—ACCEPTANCE—PRIVATE INTERNATIONAL LAW.
   An acceptance of an offer made by telephone completes the contract as of the place where the acceptance is communicated.

6. SAME—FRAUDS, STATUTE OF.
   Illinois having no statute of frauds, an offer accepted by telephone from Chicago is valid, although the amount of property involved exceeds $50.

7. SAME.
   In order to bind the plaintiff, it was not essential that it should have title to the stock which it bound itself to secure.

Error to Jackson; Parkinson, J. Submitted January 12, 1914. (Docket No. 54.) Decided April 9, 1914.

Assumpsit by Dudley A. Tyng & Company, a foreign corporation, against Warren T. Converse for breach of contract of sale: Judgment for plaintiff. Defendant brings error. Affirmed.

*Wilson & Cobb*, for appellant.

*Price & Whiting*, for appellee.

KUHN, J. The plaintiff, an Illinois corporation, brought an action in assumpsit against the defendant to recover the difference between the agreed price of $138 per share and the price received at a sale, $120 per share, for 50 shares of the common capital stock of the American Fork & Hoe Company. The defendant, who had traded in this stock, on March 31, 1911, sent plaintiff the following letter:

"DUDLEY A. TYNG & CO.,
      "Chicago.
"*Gentlemen:*
   "I will buy any part of 50 shares American Fork & Hoe Com. at 138 per share. Advise me promptly if you have anything to offer at this price.
                         "Very truly,
                              "W. T. CONVERSE."

In reply he received the following:

"CHICAGO, April 1, 1911.
"MR. W. T. CONVERSE,
        "Jackson, Mich.
"*Dear Sir:*
    "We note that you have raised your offer on American Fork & Hoe common, and will buy any part of 50 shares at $138 per share, and we will keep the same open until canceled.

    "We regret we were unable to fill the last order we had from you, but other people bid our client a higher price than we could afford to pay and stock got away from us.

    "We thank you for your business to date however and hope we may serve you in the near future.

                    "Yours truly,
                    "DUDLEY A. TYNG & CO.,
                        "By A. M. ANDREWS."

Between the 5th and 8th of April, Mr. Andrews, in Chicago, representing the plaintiff company, and the defendant, in Jackson, had a conversation over the long-distance telephone. There is no dispute that such a conversation took place, but some controversy is had as to what the conversation was. It is contended by Mr. Andrews, that his company had carried on its books for the defendant what is known as an open order for 50 shares of the stock at $138 per share; that while carrying this order the defendant bought 28 shares of the common stock of the same company at $145 per share; and that when the talk occurred by which the defendant ratified this order for 28 shares at $145 each, he asked the defendant if he wanted to cancel his order for 50 shares at $138, and that the defendant replied, "No, let it stay in. I will be very glad to get it at that price any time I can get it;" and that he replied, "Very well, we will leave it open as it stands." Mr. Converse, on the other hand, claims that when asked by Mr. Andrews in the telephone conversation concerning the so-called order for 50 shares he said that while he would have been glad to get that stock, he was at the time well

supplied and had all he could handle, and denied that he made the statements testified to by Andrews. On April 19th plaintiff sent defendant this telegram:

"W. T. CONVERSE,
  "Amn. Fork & Hoe Co.,
    "Jackson, Mich.
"Sold you fifty American Fork Hoe hundred thirty-eight as per your open order can possibly supply fifty more.

"DUDLEY A. TYNG & CO.
  "1234 p. m."

—and received in reply:

"DUDLEY A. TYNG & CO.,
  "184 La Salle St. Chgo.
"Cannot accept the fifty shares. Have bought all can handle.

"W. T. CONVERSE."

On the same day the following letters were exchanged between the parties:

"CHICAGO, April 19, 1911.
"MR. W. T. CONVERSE,
  "American Fork & Hoe Co.,
    "Jackson, Mich.
"*Dear Sir:*
"We hereby confirm wires passed between us to-day: 'Sold you fifty American Fork Hoe hundred thirty-eight as per your open order. Can possibly supply fifty more.' Your reply: 'Cannot accept the fifty shares. Have bought all can handle.'

"In the writer's subsequent conversation with you over the long-distance telephone you acknowledge having given us this order and that you had bought the stock some place else without canceling it.

"We have acted in good faith and up to this time our deals with you have always been satisfactory. We had no reason to suppose that you were in any trouble or were not in a position to take stock for which you gave us orders. We believe you to be an honorable man and ready to take care of your obligations when possible. We have therefore offered to carry this stock for you if you will give us $500 or

$1,000 on account to take care of the matter until you can get straightened around.

"The writer particularly asked at the time we sold you the last block of stock whether or not you wanted this order canceled at $138 and you told him no, if we could get it at that price you would be glad to take it.

"We hope you will see your way clear to take care of us, as we do not wish to go to our attorneys about a matter on which the right and wrong is so•obvious.

"We are unable to get a bid for the stock this afternoon but will try the first thing in the morning and are awaiting your letter which you have promised to write us tonight.
"Yours very truly,
"DUDLEY A. TYNG & CO.,
"By A. M. ANDREWS."

"JACKSON, MICH., Apl. 19—11.
"DUDLEY A. TYNG & CO.,
     "Chicago.
*"Gentlemen:*
"Confirming our phone conversation will say I am very sorry I did not cancel my order with you. But since placing the order have bought two lots of you at much higher prices, and have also taken small lots from other houses, and now have all I can handle. If I had the wherewith to pay for same would be glad to get several hundred shares at present prices. Am very sure it would be a good investment. The stock I have recently bought has all been put with the bank, and I have gone my limit. Cannot take more at present at any price.
"Very truly,
"W. T. CONVERSE."

Mr. Andrews testified that after receiving the telegram in which defendant refused to take the 50 shares he called him by long-distance telephone, and Mr. Converse said, in substance, that he was sorry he had forgotten to cancel the order, but that he was unable to purchase the stock and would write fully about it that night. It is plaintiff's claim that when defendant refused to take the stock they offered it on the

market and sold it on April 21st at the best price obtainable, $120 per share. Plaintiff, in the trial court, had a verdict for $943.12, the difference between the price contracted for and the price received at the sale, and interest thereon. It is the contention of the defendant that the letter of March 31st was a present offer to buy, and that to have made a binding contract it would have been necessary for plaintiff to accept the offer without any terms or conditions, and that the letter of April 1st was not such an acceptance. It is the theory of the plaintiff, and it was upon this theory that the case was tried and submitted to the jury, that the correspondence and telephone conversation created an open or standing order which was accepted when the plaintiff notified the defendant that it had sold him the stock as per such open order. It is an elementary proposition that before an offer can become a binding promise and result in a contract it must be accepted. While there is dispute as to what the telephone conversation in the early part of April was, the claim that there was an open or standing order, and that it was so understood by the parties, received its strongest corroboration in the letter of April 19th, in which defendant says:

"Confirming our phone conversation will say I am very sorry I did not cancel my order with you."

This is a direct admission that he considered that he had an open order with plaintiff which he failed to cancel. There can be no question that if plaintiff had failed or refused to deliver the stock after agreeing to furnish in the telegram of April 19th, it would have been liable in damages to the defendant.

It is contended by the defendant that if there was a contract it was a Michigan contract, and that if the telephone conversation is held to be binding, it should be governed by the laws of Michigan, which provide that an oral agreement to purchase property

of the value of $50 or upwards is not binding unless in writing. Section 9516, 3 Comp. Laws (4 How. Stat. [2d Ed.] § 11400). There is no question in our minds that if there was an acceptance of the offer it was accepted in Chicago. An offer may be accepted by telegram or by telephone. *Bank of Yolo* v. *Flour Co.*, 141 Cal. 314 (74 Pac. 855, 65 L. R. A. 90).

Elliott, in his work on Contracts, vol. 1, § 46, says:

"Contracts may be consummated by means of telephonic conversations. When a person places himself in connection with another by means of the telephone system he thereby invites communication relative to his business through that channel. In a recent case, referring to an argument against the validity of such a contract, it is said:

"'If by this is meant that a contract cannot be made by telephone conversation, it is too late to so argue. A large part of our business transactions are, in this century, carried on by telephone. Our courts have long ago held that contracts made by telephone are as effective and binding in law as if made verbally between the parties standing face to face and carrying on the conversation which culminates in the contract.'"

Also, at section 62:

"The place of the contract is also usually determined by the place where the acceptance is given. Thus, an order to make certain bets having been transmitted by postal telegraph from the plaintiff without the city of London to the defendant within it, he telegraphed from the city that the order had been obeyed. It was held that the contract of agency was made in the city. And where an offer was made in Boston, and accepted by telegram from Providence, it was held that the contract was made in Rhode Island, although to be performed in Massachusetts. Likewise the contract is made at the place when the acceptance is mailed. If the communications are had over the telephone the contract is deemed to have been made at the place where the offer of one is accepted by another. The place of contract is material as *prima facie* denoting the law by which it is to be construed and regulated."

It is clear that if a contract was established it was an Illinois contract (*Douglass* v. *Paine*, 141 Mich. 485 [104 N. W. 781]), and it was conceded upon the trial that there is no statute of frauds in Illinois in reference to the sale of goods, wares, and merchandise.

It is further contended that if there was a binding contract plaintiff did not, at the time, have control of the stock, and could not have delivered it. The plaintiff had bound itself to deliver the stock, and the defendant refused to accept it. It was not necessary for plaintiff, in order to bind itself in the way that it did, to have had title to the stock. *Gregory* v. *Wendell*, 40 Mich. 432.

We have examined the assignments of error with care, and we are of the opinion that the issue involved was properly submitted to the jury without prejudicial error.

Judgment affirmed.

McALVAY, C. J., and BROOKE, STONE, OSTRANDER, BIRD, MOORE, and STEERE, JJ., concurred.