CARTER, MACY COMPANY, INC., Respondent, *v.* GEORGE T. MATTHEWS and Another, Appellants.

First Department, June 3, 1927.

Sales — action to recover purchase price of tea — alleged contract called for " Government Standard Congou tea "— phrase " Government Standard Congou tea " is, under evidence, ambiguous and presented question for jury — plaintiff cannot recover purchase price since tea was sold " To arrive " at price " Ex Warehouse " and was rejected before arrival — title never passed to defendants — Personal Property Law, §§ 100, 144, applied — allowing recovery on theory of constructive delivery was error — theory of appropriation to contract was not sustained — Statute of Frauds — contract was unenforcible under Personal Property Law, § 85 — sales slip and letters not sufficient memorandum — receipt of samples of tea did not constitute partial delivery — defendants not estopped from denying liability for purchase price by pleading setoff for amount of resale.

This is an action to recover the purchase price of tea. The alleged contract called for " Government Standard Congou tea." Samples were submitted to the defendants and were rejected on the ground that they did not comply with the government standard as to style and appearance of leaf. The phrase " Government Standard Congou tea " in the alleged contract is ambiguous, since it appears that the plaintiff contends that the tea conformed to the government standard inasmuch as it was admitted by the Federal inspectors while the defendants contend that the tea should have conformed to the government samples, not only in purity, but also in style or appearance of leaf, which last quality is of considerable commercial value. It was error, therefore, to direct a verdict for the plaintiff, for the question as to what was intended by the term " Government Standard Congou tea," should, under the evidence, have been submitted to the jury.

Furthermore, the plaintiff cannot recover in this action for the purchase price, since it appears that the tea was sold " To arrive " at a price " Ex Warehouse " for delivery in New York city within a reasonable time after its arrival, and the alleged sales slip, not being signed, was an unenforcible contract. Since the tea was rejected before its arrival, there was no transfer of title and hence an action for the purchase price cannot be maintained under section 144 of the Personal Property Law.

In the absence of evidence showing that it was the intention of the parties that title should pass before delivery, whether or not delivery was made and title transferred is to be determined by the rules prescribed by section 100 of the Personal Property Law.

Applying rule 5 of section 100 of the Personal Property Law to the facts in this case, title to the tea would not pass before its arrival in New York, and since it was rejected prior to that time, no title passed to the defendants.

The contention by the plaintiff that title passed under rule 4 of section 100 of the Personal Property Law upon the theory of an appropriation of the tea to the contract cannot be sustained, for the plaintiff's complaint alleged actual delivery and not a constructive delivery. Proof of constructive delivery constitutes a fatal variance between pleading and proof.

Moreover, even if proof of passing of title in the goods by appropriation were available to the plaintiff, it failed to establish the essential element that tho defendants consented to the transfer and that, notwithstanding the alleged contract, it was the intention of the parties that title should pass prior to the delivery in New York city.

Furthermore, the contracts are unenforcible under section 85 of the Personal Property Law in that there was no note or memorandum in writing of the contract signed by the defendants. The alleged sales slip in reference to the first contract was unsigned and in none of the letters written by the defendants is there any admission of all of the essential terms of the contract alleged by the plaintiff, nor any direct reference to the sales slip.

The defense of the Statute of Frauds is not overcome by the fact that the defendants received and retained samples of the tea, for the samples were not delivered to the defendants as a partial delivery of the entire orders but merely for the purpose of giving the defendants an opportunity to inspect the tea prior to its receipt.

The defendants are not estopped from denying liability because they pleaded a setoff in their answers for the amount received on the resale of the tea by the plaintiff. A defendant may set up inconsistent defenses in an answer and rely upon whichever of such defenses he may be able to establish.

APPEAL by the defendants, George T. Matthews and another, from a judgment of the Supreme Court in favor of the plaintiff, entered in the office of the clerk of the county of New York on the 6th day of February, 1926, upon the verdict of a jury rendered by direction of the court, and also from an order entered in said clerk's office on the 24th day of February, 1926, denying defendants' motion for a new trial made upon the minutes.

*Thomas Gregory* of counsel [*William E. Vogel* with him on the brief], for the appellants.

*Clifton P. Williamson* of counsel [*Edward W. Bourne* with him on the brief; *Alexander & Green,* attorneys], for the respondent.

FINCH, J. The questions presented by this appeal are whether there is an ambiguity in a term of a contract so as to present an issue of fact, whether an action may be brought for the purchase price or only for the damages suffered, and whether the action is barred by the Statute of Frauds.

The plaintiff brought three actions against the defendants to recover the purchase price of three lots of tea. These were consolidated and tried as one action. In the first action the plaintiff alleged that plaintiff's assignor " agreed to deliver to the defendants at New York 900 half chests of Government Standard Congou tea from the steamship ' Bellerophron ' within a reasonable time after the arrival of the said steamship at New York, and the defendants agreed to accept the same and to pay therefor the sum of seventeen cents per pound within thirty days after the delivery or a tender of delivery thereof." In the second action a similar agreement was

alleged covering 700 half chests of Government Standard Congou tea from the steamship *Perseus.* The third action alleges a similar agreement covering 800 half chests of Government Standard Congou tea from the steamship *Karonga.* In each action it was alleged that the plaintiff was ready and willing to deliver the tea within a reasonable time after the arrival of the respective steamers, and duly tendered the same. At the trial the complaints were amended so as to state that by the contracts sued on the plaintiff sold and agreed to deliver the tea in question, and did deliver the same.

The defendants in their answers, besides putting in issue the material allegations of the complaint, as separate defenses pleaded, *first,* the Statute of Frauds; *second,* to the effect that the teas tendered did not conform to the requirements of the contract, and as a partial defense alleged that the plaintiffs resold the teas without exercising reasonable care and judgment, resulting in the obtaining of a less price than the fair market value of the tea.

Considering first the question whether there was an ambiguity in the contracts as to the kind of tea agreed upon. The contracts provided for the delivery of " Government Standard Congou tea." Upon the trial it appeared that samples of tea, as representative of the tea to be delivered, had been submitted to the defendants and that the defendants had refused to accept the tea upon the ground that the samples were not equal in physical appearance and in quality to certain samples of tea known as " Government Standard Congou." These government samples are prepared annually by a board of seven tea experts, appointed by the Secretary of Agriculture under a Federal statute colloquially known as the " Tea Act," being entitled " An act to prevent the importation of impure and unwholesome tea " (29 U. S. Stat. at Large, 605; U. S. Comp. St. 1916, p. 9581). This board annually submits to the Secretary of Agriculture " standard samples of tea," as required by section 2 of the said " Tea Act." Section 3 provides that the Secretary of Agriculture, upon the recommendation of said board, shall fix and establish " * * * uniform standards of purity, quality, and fitness for consumption of all kinds of teas imported into the United States, and shall procure and deposit in the Custom Houses of the ports of New York, Chicago, San Francisco, and such other ports as he may determine, duplicate samples of such standards; that said Secretary shall procure a sufficient number of other duplicate samples of such standards to supply the importers and dealers in tea at all ports desiring the same at cost."

These samples are put up in sealed half pound tins, and by way of example (as appears from exhibit submitted) stamped:

" U. S. Government
Standard
Congou
No. 2
1923 — 1924 "

Apart from these standard samples, the Department of Agriculture issues a set of regulations prescribed for the direction and guidance of the tea examiners in admitting tea to the country. Regulation No. 28 thereof provides: " Should a tea prove on examination to be inferior to the standard in any one of the requisites — namely, quality, quality of infused leaf, or purity — it would justly be rejected, notwithstanding the fact that it may be superior to the standards in some of the qualifications. No consideration shall be given to the appearance or so-called style of the dry leaf."

Upon this record, apparently what took place was that the teas which were submitted to the defendants by the plaintiff were teas which were passed by the government inspectors, but which did not conform to the United States Government Standard in appearance or so-called style of the dry leaf and, in consequence, were worth about four cents a pound less than tea which conformed to the United States Government Standard Congou samples. The learned trial justice directed a verdict for the plaintiff, thus holding that if the tea was admitted to the country, it satisfied the requirements of the contract within the meaning of the term " Government Standard." In other words, that in passing the tea examiners it must thereby have conformed to a standard set up by the government and so come within the wording of the contract. It would seem, however, that the test is not mere admittance to the country, but a conformation to the Government Standard samples. As noted, the Federal statute specifically provides for the establishment by the Secretary of Agriculture of standard samples and the furnishing of the same to the importers and dealers in tea at all ports desiring the same. This obviously is the Government Standard and is so specifically named in the statute. As against this, the passing of a shipment of tea by any one of a number of government inspectors shows merely that the tea conforms to the requirements of the admission of tea to the country, but not necessarily to the standard samples prepared annually by the board of tea experts. The object of the regulations for the admission of tea into the United States is solely to protect the public against unwholesome or impure tea and has, therefore, no concern with its value commercially. Consequently, appearance and style are entirely excluded. On the other hand, the parties to this cause are vitally interested in commercial value, as the tea is purchased

for resale. Style and appearance are, therefore, of primary importance to them. If all the parties intended by providing in their agreements for the sale and delivery of " Government Standard Congou " tea, was admittance into the country, then such provision was superfluous, for unless the plaintiff could bring the tea into the country it could not make delivery ex-warehouse, New York. Under the well-known principle that all the terms of a contract should be construed and are assumed to have some purpose and meaning attributed to them, the term " Government Standard Congou tea " must be construed as relating to the government standard samples set up annually by the board of tea experts. Furthermore, the " Tea Act " provides for appeals from the conclusions of the tea examiners only by the Collector of Customs, importers or consignees. As defendants were neither importers nor consignees, it is not reasonable to assume that they would bind themselves to pay a fixed price for any tea that might gain admission into the country without recourse against the propriety of such admission. A contract should not receive an unreasonable construction. As was said by Judge CRANE in *Fleischman* v. *Furgueson* (223 N. Y. 235, 241): " It is a well-established canon of interpretation that in seeking for the intent of the parties the fact that a construction contended for would make the contract unreasonable may be properly taken into consideration. A court will endeavor to give the construction most equitable to both parties instead of the construction which will give one of them an unfair and unreasonable advantage over the other."

There at least was an ambiguity in the alleged contract which required a submission to the jury. Many witnesses were called by each side on the issue as to what the parties to this agreement meant, and what was the usage and custom in the tea trade, by the term " Government Standard." The facts were in dispute, and hence what the parties meant by the use of this ambiguous term in the contract presented a question for the jury under all the evidence. (*U. S. Rubber Co.* v. *Silverstein*, 229 N. Y. 168.) If there had been no dispute as to the facts, the interpretation of the written instrument would have been for the court. It was, therefore, error to direct a verdict in favor of the plaintiff, and this error would have required the granting of a new trial were it not for two fundamental objections which bar the maintenance of this action.

*First*, the facts show that the plaintiff may not sue for the purchase price. As before noted, the actions were brought for the purchase price of the tea, upon the theory that title to the goods had passed to the defendants. In this connection the essential facts are not in dispute. The plaintiff relies upon a written

memorandum of sale of the tea involved in the first cause of action "To arrive" at a price "Ex Warehouse." The complaint alleges that the tea was to be delivered to the defendants at New York within a reasonable time after arrival. While the sales memorandum was unsigned and hence did not constitute an enforcible contract, yet the plaintiff assumes that its terms apply to all the causes of action. We, therefore, have an unenforcible contract of sale of certain tea "to arrive New York." Before the arrival of the tea 'n New York, the defendants notified the plaintiff that they would not accept any tea. Under these circumstances there was no transfer of title, and hence the action for the price cannot be maintained. Prior to the enactment of the Sales Act a seller who tendered goods to a buyer in conformity with the contract of sale might, if the buyer wrongfully rejected the goods, in a cause such as the one at bar, maintain an action for the price, notwithstanding there had been no transfer of title. Under the provisions of the Sales Act, however, in order to maintain an action for the price, there must have been a transfer of title in the property. (Pers. Prop. Law, § 144, as added by Laws of 1911, chap. 571.) Whether there was such a transfer depends upon the intention of the parties, and such intention, in the absence of express provision or controlling circumstances, is to be determined from certain rules prescribed by the statute. (Pers. Prop. Law, § 100, as added by Laws of 1911, chap. 571; *Glass & Co.* v. *Misroch*, 239 N. Y. 475.) By rule 5 of section 100 it is provided that "If the contract to sell requires the seller to deliver the goods to the buyer, or at a particular place, or to pay the freight or cost of transportation to the buyer, or to a particular place, the property does not pass until the goods have been delivered to the buyer or reached the place agreed upon."

In the case at bar the contract, as noted, required the seller to deliver the goods at New York and the tea was sold at a price ex warehouse New York, the seller paying all freight and other incidental expenses up to such a time as the tea was released. Under the aforesaid principle, therefore, title to the tea would not pass to the defendants before the arrival of the tea in New York. Since the tea was rejected prior to its arrival and the plaintiff notified that no teas would be accepted by the defendants, it is clear that the property in the goods did not pass to defendants, and hence plaintiff cannot maintain an action for the price.

The plaintiff urges, however, that there was a transfer of title to the tea under the provision of rule 4 of section 100 of the Personal Property Law, upon the theory that there had been an appropriation of the tea to the contract with the assent of the defendants. In the first place, plaintiff's complaint alleged an

actual delivery of the tea in accordance with the terms of the contract. When it appeared upon the trial that the plaintiff intended to rely upon a constructive delivery under the statute, the defendants pleaded surprise. Nevertheless the learned trial court directed a verdict upon the theory that there had been a constructive delivery by appropriation. This was a fatal variance between the pleading and the proof, and the judgment so obtained cannot be sustained. As was said by LAUGHLIN, J., writing for a unanimous court in *Bready* v. *Wechsler Co., Inc.* (200 App. Div. 78, 81; affd., 235 N. Y. 539): " In *Robison & Co., Inc.*, v. *Kram, No. 1* (195 App. Div. 873) we held that where a recovery is sought on the theory that the title has passed to the buyer, not by actual delivery but by the goods having been appropriated to the contract under subdivision 1 of rule 4 of section 100, the facts showing that under the statute the property in the goods passed to the buyer, should be alleged to the end that the defendant may be apprised of the plaintiff's claim in that regard. That decision is controlling here and requires a reversal."

Moreover, even if proof of a passing of property in the goods by appropriation under the statute were available to the plaintiff, the plaintiff failed to establish an essential element thereof, namely, the consent of the defendants, and also failed to show that it was the intention of the parties that notwithstanding by the alleged contracts the goods were sold to arrive at New York, title in the goods passed to the defendants prior to such arrival. Upon the contrary, everything points to the conclusion that the intention of the parties was in accordance with the presumption prescribed by rule 5 of section 101, namely, that title continued in the plaintiff until the goods arrived at New York and were released.

An additional and compelling reason for the reversal of this judgment is that the proof sustains the defense of the Statute of Frauds. Section 85 of the Personal Property Law (as added by Laws of 1911, chap. 571) reads as follows: " A contract to sell or a sale of any goods or choses in action of the value of fifty dollars or upwards shall not be enforceable by action unless the buyer shall accept part of the goods or choses in action so contracted to be sold or sold, and actually receive the same, or give something in earnest to bind the contract, or in part payment, or unless some note or memorandum in writing of the contract or sale be signed by the party to be charged or his agent in that behalf." No part of the purchase price was paid by the defendants and the evidence shows that no part of the goods was received and accepted. It was necessary, therefore, for the plaintiff to establish some note or memorandum in writing of the contract

signed by the defendants. To this end the plaintiff relies upon a sales slip alleged to cover the tea involved in the first cause of action in conjunction with certain letters passing between the parties. In connection with the first cause of action only was there a sales slip. This sales slip was not signed by either of the defendants. It reads as follows:

" CARTER, MACY & CO., INC.

| 106 & 108 Water Street | | 8/8 1923 | Sale No. |
| 140 & 142 Pearl Street | | | |
| New York | Sold to | G. T. Matthews | |
| | | Terms 3/30 | |

" Ship via

   All

                 Tare  Net Wt.

| " Index No. | Pkgs | Kind | Mark No. | Price | Cargo No. | Each | Each |
| " 900 | | Congou | | 17 | | | |
| " To arrive | | | | | Ex Warehouse | | |

        " MEMORANDUM

  " Remarks  No Brokerage  · Sale made by Bollman

             " Sale approved by "

Thereafter the following correspondence took place between the parties:

                 " Oct. 15th, 1923.

" G. T. MATTHEWS & Co.,

  " 105 Water Street, N. Y. City.

" DEAR MR. MATTHEWS.—

" We are giving you as per the attached list particulars on the 900 H/Cs Congous which you purchased from us to arrive at 17c. 3% 30 days. These teas are to arrive on the SS Bellerophron due about Nov. 15th, and we shall send you samples as soon as we receive same.  Yours truly,

      " CARTER MACY & CO., INC.

        " SALES DEPARTMENT."

       " NEW YORK, Nov. 28, 1923.

" Messrs. CARTER, MACY & Co.,

    " New York City.

" GENTLEMEN.— Upon examination of the samples submitted of 900 H/c lot, Ex. Bellerophron and of 1,500 H/c Ex. Karonga and Perseus, Congou tea, we find them all so poor and inferior that we cannot accept delivery.

      " Very truly yours,

       " G. T. MATTHEWS & CO.

" GTM/HBR       per G. T. MATTHEWS "

" *November 28th,* 1923.

" Messrs. GEO. T. MATTHEWS & Co.,
       " 105 Water Street
            " New York, N. Y.

" GENTLEMEN.— We beg to acknowledge receipt of your favor of November 28th, in which you state that upon examination of sample submitted of the two lots of Congou Teas, namely 900 H/c Ex. S/S Bellerophron and 1,500 H/c Ex. S/S Karonga and S/S Perseus, you find they are too poor to accept delivery.

" These teas were sold to you as Government Standard Congous and we believe in accordance with the custom of the tea trade as far as Carter, Macy & Company is concerned, if these teas are released by the United States Government Inspector, they are your property and not ours. As you know, these teas have not yet been released and we will keep you notified as to the progress the inspector is making against these shipments.

                " Yours truly,
          " CARTER, MACY & COMPANY, INC.
                       " BOLLMAN
" WB/MMD.                  Sales Department."

" *December 7th,* 1923.

" Messrs. G. T. MATTHEWS & Co.,
       " 105 Water Street,
            " New York, N. Y.

" GENTLEMEN.— We beg to hand you herewith delivery order and invoice covering 900 H/C of United States Government Standard Congou, Ex. S/S Bellerophron, which are now spot and ready for delivery. We are handing you this delivery order in execution of contract sold you for 900 H/C United States Government Standard Congous at 17c.

                " Yours truly,
          " CARTER, MACY & COMPANY, INC.
                       " BOLLMAN
" WB/MMD                  Sales Department."

" *Dec. 8th,* 1923.

" CARTER, MACY & Co.,
          " City.

" GENTLEMEN.— For reasons as stated to you in our letter of the 28th November, we herewith return your delivery order and invoice covering these teas.

             " Yours very truly,
          " G. T. MATTHEWS & COMPANY,
" GTMJR/L                G. T. MATTHEWS, JR."

"NEW YORK, *December* 12, 1923.

"GEO. T. MATTHEWS & COMPANY,
          "105 Water Street,
                    "New York City.
                    "Att. Mr. Matthews, Senior.

"DEAR MR. MATTHEWS.— Referring to our sale of Congou teas to you, I am advised that the proper friendly procedure to take in a matter of this kind is to let it go before the Board of Arbitration of the Tea Association of America, and I, therefore, request your approval of this step.

          "Yours very truly,
                    "CARTER, MACY & COMPANY, INC.,
"AND /AMS                              A. N. DAROWIN, *President.*"

                    "NEW YORK, *December* 12*th*, 1923.
"CARTER, MACY & COMPANY, INC.,
                    "New York.

"GENTLEMEN.— Replying to your letter of this date, we do not like to decline an offer to arbitrate a business difference, but frankly we find it difficult to see that this matter warrants an arbitration.

"We were entitled to teas *equal* to the Government Standard and we think you must agree that we did not receive same.

                    "Very truly yours,
          "GEORGE T. MATTHEWS & COMPANY,
"GTMJR /L                              G. T. MATTHEWS."

It is upon the foregoing correspondence, supplemented by the unsigned sales slip, that the plaintiff relies to establish a "note or memorandum in writing of the contract * * * signed by the party to be charged." In none of the letters signed by the defendants, however, is there any admission of all the essential terms of the contracts alleged by the plaintiff; nor is there any direct reference to the sales slip covering the tea for the price of which the plaintiff sues in the first cause of action. There is, therefore, no basis for contending that the defendants, even by reference, over their signature have conceded or recognized the existence of contracts containing all the terms alleged by the plaintiff, even as to the first cause of action. Much less is there any basis for such a contention in respect to the second and third causes of action, in which there were no written sales slips whatsoever. There undoubtedly is some basis for urging that the evidence shows the defendants assumed there was some agreement to purchase some tea. This, however, is not sufficient. In order to satisfy the requirements of the statute, the writings signed by the defendants must, by

direct statement or by reference to other writings, comprise all the essential terms of the contract. None of such terms may be supplied by oral evidence or by writings not signed by the defendants and not referred to by the defendants over their signatures as containing such terms. As was said by DOWLING, J. (now presiding justice), in *Talcott, Inc.*, v. *Greenstein* (210 App. Div. 633): " It is proper to indicate here that in our opinion all the writings taken together do not constitute a written, enforcible contract. The written memorandum of September ninth, the basis of plaintiff's claim, which was not signed by defendants, requires some writing signed by defendants accepting its terms, by reference or direct statement, to make it valid. * * * The defendants' letter of October twenty-sixth said the goods would not be accepted, as the order had already been canceled. * * * These writings do not admit, accept or confirm any contract whatever." Also in *Evans* v. *Pelta* (146 App. Div. 749), MILLER, J., writing for the court, said: "At most, the letters contain an admission that the defendants had ordered certain goods without disclosing the kind, quantity or purchase price. The letters contain no reference either to the memorandum made by the salesman at the time of receiving the order or to the invoice mailed by the plaintiffs on May sixth. While it is quite true that the evidence necessary to satisfy the statute need not all be comprised in a single writing, it still is equally true that verbal evidence cannot be resorted to in order to supply any of the essential terms of the contract which the writing or writings relied upon omit." And in *Poel* v. *Brunswick-Balke-Collender Co.* (216 N. Y. 310), Judge SEABURY said: " In order to satisfy the requirements of the Statute of Frauds the written note or memorandum must include all the terms of the completed contract which the parties made. It is not sufficient that the note or memorandum may express the terms of a contract. It is essential that it shall completely evidence the contract which the parties made." The plaintiff thus failed to prove a note or memorandum in writing of the contracts signed by the defendants.

The plaintiff urges, however, that the defense of the statute was overcome by proof that the defendants received and retained samples of the tea. These samples, however, were submitted to the defendants not as a partial delivery on account of the alleged contracts, but merely by way of affording the defendants an opportunity to determine whether they would accept delivery of tea subsequently to be tendered. The defendants advised the plaintiff that delivery would not be accepted. The samples were thus submitted for a special purpose only, and not as a partial delivery of the goods

44

sold. Title cannot in any such manner be forced upon an unwilling purchaser. As was said by Judge Cardozo in *Glass & Co.* v. *Misroch* (239 N. Y. 475): " Delivery to be operative as a transfer of the property must be assented to by the buyer (Williston, Sales [2d ed.], § 472; cf. § 280, p. 592). The seller may not force the goods upon a buyer unwilling to receive them."

It is further urged by the plaintiff that the defendants are estopped from denying liability for the purchase price of the tea by reason of having claimed in their answers a setoff for the amount of the resale, upon the ground that this claim is inconsistent with the defendants' contention that the property in the goods had not passed to them. It is well settled, however, that a defendant may set up inconsistent defenses in an answer, and rely upon whichever of such defenses he may be able to establish. (*Societa Italiana* v. *Sulzer*, 138 N. Y. 468; Civ. Prac. Act, § 262.) In the case at bar, therefore, the defendants were entitled to deny the passing of title in the goods as a matter of law, and without prejudice to this denial, to claim the proceeds of a resale by the plaintiff in the event the question of the passing of title were determined adversely to them.

It follows that the judgment and order appealed from should be reversed, with costs, and the complaint dismissed, with costs.

Dowling, P. J., McAvoy, Martin and O'Malley, JJ., concur.

Judgment and order reversed, with costs, and the complaint dismissed, with costs.